**UNITED STATES DISTRICT COURT**
**IN THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

| | |
|---|---|
| **LAVERNE JOHNSON,** )<br><br>      **Plaintiff,** )<br><br>**v.** )<br><br>**PARKWOOD BEHAVIORAL HEALTH** )<br>**SYSTEM, an entity owned by** )<br>**UNIVERSAL HEALTH SERVICES** )<br>**FOUNDATION, a/k/a UNIVERSAL** )<br>**HEALTH SERVICES, INC. a Foreign** )<br>**Corporation,** )<br><br>      **Defendant.** ) | **Case No. 2:11-CV-212**<br>**Jury Demand** |

**DEFENDANT PARKWOOD BEHAVIORAL HEALTH SYSTEM'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Defendant Parkwood Behavioral Health System's Motion for Summary Judgment should be granted as there are no genuine issues of material fact and Plaintiff's claims should be dismissed as a matter of law.  Plaintiff is unable to establish a *prima facie* case of disability discrimination and/or retaliation.  Plaintiff's termination had absolutely nothing to do with any alleged disability, but instead resulted from her inability or refusal to perform her job, despite being coached and warned multiple times.  Likewise, with regard to her retaliation claim, Plaintiff cannot establish that she engaged in any protected activity or any causal connection to her termination.  Finally, Plaintiff cannot establish a *prima facie* case of failure to accommodate under the ADA because Parkwood provided Plaintiff with every reasonable accommodation requested.

Moreover, Plaintiff is unable to prove that Parkwood's legitimate nondiscriminatory/nonretaliatory reason for her discharge – her failure to perform her duties

despite repeated counseling and warnings - was pretext. As such, Parkwood is entitled to judgment as a matter of law, and Plaintiff's lawsuit should be dismissed.

## II.     SUMMARY OF FACTS

### A.     Parkwood

Parkwood operates a behavioral healthcare facility, providing comprehensive behavioral health and addictive disease treatment for adults, adolescents and children. (Pl. Dep., 130:24;131:7;169:14-25;170:1-13). Parkwood's specialized programs (including in-patient, partial in-patient, intensive out-patient and residential treatment) treat disorders such as depression and anxiety, as well as addictive disease disorders such as alcoholism and drug addiction. (Tyler Decl., ¶2).

When patients come to Parkwood for treatment, they are in crisis, i.e. are experiencing severe mental health and/or addictive disease issues and may be at risk for hurting themselves or someone else. (A. Johnson Dep., 42:4-43:10). Parkwood's goal is to provide the medical treatment needed to stabilize the patient sufficiently for discharge, then provide a discharge plan so the patient can move to an outpatient level of care and continue his/her road to recovery.[1] (Id.).

---

[1] "Stepping down" the patient from intensive inpatient treatment to a form of outpatient treatment reduces the likelihood of relapse and increases the patient's chances for a full recovery. (A. Johnson Dep., 42:4-43:10). Likewise, making sure the patient's treatment is covered by his/her health insurance helps the patient transition out of inpatient treatment and into his/her home environment with as little stress as possible, again reducing the likelihood of relapse. (Pl. Dep., 170:14-25;171:1-2; Wallace Decl., ¶4). In addition to the general stress associated with mental health and/or substance abuse issues, treatment itself can cause an overwhelming amount of stress on an individual and his/her family. (A. Johnson Dep., 42:4-25;43:10; Pl. Dep., 170:14-18). Because many times patients are treated on an inpatient basis, the patient is away from his/her family and living at Parkwood during treatment. (Pl. Dep. 169:14-23). Other times, the patient receives intensive outpatient treatment which means the patient goes home each day, but spends a good portion of the day at Parkwood receiving treatment. (Pl. Dep. 169:14-25;170:1-3). Parkwood also provides residential treatment and outpatient treatment. (Pl. Dep., 170:4-9). The level of care depends entirely upon the severity of the patient's needs. (Pl. Dep., 170:10-13).

B.    **Parkwood's Management Team**

Kurt Isaacson ("Mr. Isaacson") was the Chief Executive Officer ("CEO") of Parkwood when Plaintiff Laverne Johnson ("Plaintiff" or "Johnson") was hired. (Pl. Dep., 134: 21-23; A. Johnson Dep. 9:11-13). Ken House ("Mr. House") was the CEO of Parkwood when Plaintiff was terminated. (A. Johnson Dep., 9:6-7; Pl. Dep., 201:22-24). Sandra Wallace ("Ms. Wallace") was the Chief Financial Officer ("CFO") and was Plaintiff's supervisor when Plaintiff was hired. (Pl. Dep., 130:6-10;164:19-23; Wallace Decl., ¶2). Joyce Tyler ("Ms. Tyler") was the Director of Quality & Risk Management and Plaintiff's supervisor at the time of her termination. (A. Johnson Dep., 26:6-25;27:1-9;41:9-13; Tyler Decl., ¶2). Audrey Johnson ("A. Johnson") is the Human Resources Director. (A. Johnson Dep., 8:3-17).

C.    **Johnson's Applies for Work at Parkwood**

On September 23, 2008, Plaintiff applied for an available Director of Utilization Review ("Director of UR") position. (Pl. Dep., 147: 4-25; 148: 1-2; Ex. 15). Plaintiff was interviewed by Ms. Wallace and the Parkwood Medical Director, Dr. Paul King ("Dr. King"). (A. Johnson Dep., 17:2-19).[2] Ms. Wallace was responsible for hiring a Director of UR and decided to hire Plaintiff. (A. Johnson Dep., 11:3-22; Wallace Decl., ¶2).[3] Parkwood sent Plaintiff an offer letter on October 31, 2008 which set forth the terms of her employment offer, including an annual salary of $50,000. (Pl. Dep., 162:7-18; Ex. 19). Plaintiff also was provided with a job description which detailed the specific job duties expected of the Director of UR. (Pl.

---

[2] Although Plaintiff believes that Dr. Saini, a physician that makes rounds at Parkwood, but which is not employed by Parkwood, "interviewed" her, there is no dispute that Dr. Saini was not an employee of Parkwood and was not involved in Plaintiff's hiring or firing. (Pl. Dep., 148:15-25;149:1-19; A. Johnson Dep., 17:2-25;18:1-5; Saini Dep., 9:6-8;17:7-25;18:1-7;23:13-16;26:13-20;27:1-11;29:3-15). Thus, it is immaterial whether Dr. Saini "interviewed" Plaintiff.

[3] In addition to supervising several departments at Parkwood, Ms. Wallace operates as the company's CFO. (Wallace Decl., ¶2; A. Johnson Dep., 19:11-13).

Dep., 156–161; Ex. 17; 18). A memorandum provided to Plaintiff instructed her to review the job description and to discuss any questions about her duties with her supervisor. (Pl. Dep., Ex. 17; 18). Notably, when hired, Plaintiff did not provide Parkwood with any information suggesting she may be disabled or would need any accommodation to perform her job.[4] (Pl. Dep., 155-161; Ex. 17 & 18). There is no dispute that at the time of Plaintiff's hire, Parkwood was wholly unaware of her alleged disability. (Saini Dep., 17:14-18;21:11-18;23:10-12;27:12-25;28:17-25;29:1-2; A. Johnson Dep., 18:6-25;19:1-7;37:8-19;38:13-25;39:1-23; Wallace Decl., ¶8; Pl. Dep., 274:6-14).

### D. Plaintiff's Role as Director of UR

On November 5, 2008, Plaintiff started work as Director of UR.[5] (Pl. Dep., 149:22-24). The Utilization Review Department ("the UR Department") is the liaison between the medical providers at Parkwood and the insurance companies that provide coverage for the patients and functions to make patients' treatment, transition from inpatient treatment and

---

[4] Plaintiff underwent a pre-employment medical screening at Concentra Medical Center on October 22, 2008. (Pl. Dep., 149;25;150:1-12; Ex. 16). Plaintiff was asked to complete an intake sheet detailing her medical history. (Pl. Dep., 150:14-23; Ex. 16). Although asked to list any hospitalizations, including the dates of the hospitalizations, Plaintiff failed to include numerous hospitalizations that she had for mental health issues. (Pl. Dep., 151:17-24). This made Plaintiff's response to the question inaccurate and incomplete. (Pl. Dep., 152:2-25;153:1-6). In addition, Plaintiff failed to disclose medications she was taking at the time of her hire by Parkwood. (Pl. Dep., 153:11-24). Specifically, Plaintiff omitted the numerous medications she was taking for her mental health issues. (Pl. Dep., 153:21-25;154:1-7). This is true even though Plaintiff certified at the bottom of the form that "[t]he above answers are true and correct to the best of my knowledge" and that she "understands that falsification may be grounds for termination." (Pl. Dep. 154:8-22; Ex. 16). According to the after-acquired evidence rule, Plaintiff's false statements on her pre-employment physical would have supported discharge from her position. See *Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106 (5th Cir.1995). The pre-employment exam document clearly states that "falsification may be grounds for termination." As such, even if Plaintiff could prove a *prima facie* case, her damages would be cut off as of the date Parkwood discovered Plaintiff's deceit. *Churchill v. Texas Dept. of Criminal Justice*, WL 4215728, at*3 (S.D.Tex. 2012) citing *McKennon v. Nashville Banner Publishing Co.*, 115 S.Ct. 879 (1995) (after-acquired evidence of wrongful conduct during employment bars employee from receiving reinstatement and/or front pay and backpay is calculated from the date of discharge to date information was discovered); see also *Wallace v. Dunn Construction Co.*, 62 F.3d 374, 378 (11th Cir.1995) (rule "applies with equal force when the after-acquired evidence concerns an employee's fraud in the application process."). (See also, Tyler Decl., ¶15.).

[5] Employees of Parkwood sometimes refer to the Director of UR as the Director of Case Management.

ultimate discharge as smooth as possible. (Pl. Dep., 168:9-25; A. Johnson Dep., 13-16). The UR Department is also responsible for ensuring any alterations in treatment/care plans, including the need for additional treatment, is coordinated with patients' insurance companies.[6] The UR Department must advocate for approval from the insurance companies to ensure coverage of the care needed by patients. (*Id*.) The UR Department is also responsible for serving as an intermediary working with various patient caregivers (i.e. physicians, therapists, nurses, mental health technicians and others) by collecting information about the patients' progress and reporting the information to the medical team. (A. Johnson Dep., 13:6-23;15:1-16).

To ensure that everyone involved in patient care has the information needed to provide the necessary level of care, Parkwood schedules meetings to facilitate the exchange of information.[7] (Pl. Dep., 172-176). Parkwood holds daily meetings called "FLASH meetings," which are attended by the Director of UR (Plaintiff), the CEO (Mr. House), the Director of Quality and Risk Management (Ms. Tyler), an employee from admissions, someone from the Needs Assessment team and anyone that has a direct link to admissions and discharges. (Pl. Dep., 174:6-25;175-176). The purpose of the FLASH meetings are to discuss, among other things, any patient that is scheduled for discharge so that Parkwood can ensure the patient is ready, from a medical standpoint, for discharge. If an appropriate discharge plan is not in place,

---

[6]Upon admission, the patient has an initial assessment. (A. Johnson Dep., 14:10-21; Pl. Dep., 176:24-25;177:1-22). The initial assessment is performed by a number of medical providers and includes a physician assessment. (*Id*.). The initial assessment determines the expected care plan for the patient and is used to obtain approval from the patient's health insurance company for whatever length of stay the physician anticipates at the time of admission. (*Id*.). As the patient undergoes treatment, the treatment plan may be altered, depending upon the patient's progress and/or whether new issues arise that were not identified during the initial assessment. (Pl. Dep., 176:1-10;177:4-25;A. Johnson Dep., 44:2-25;45:1-17). It is not uncommon for the patient to require additional days of treatment that were not anticipated at the time of the initial assessment. (Pl. Dep., 178-179).

[7] Once a week, there are Treatment Team Meetings attended by physicians, nurses, counselors, social workers, mental health technicians, the Director of UR and the patient. (Pl. Dep. 172:5-23).

the patient is at risk of relapse. (A. Johnson, Dep., 30-32;42:4-25;43:1-10; 47:3-14; Pl. Dep. 181-183:1-15).

 Plaintiff was responsible for the overall successful operation of the UR Department. More specifically, Plaintiff was responsible for being prepared for daily FLASH meetings and advocating for the insurance coverage needed. (A. Johnson Dep., 13-16; Sowell Dep., 23:8-25;24:1-20; Tyler Decl., ¶5). During the FLASH meetings, Plaintiff was supposed to be prepared to discuss the list of patients who were expected to be discharged and to be familiar with the patients' diagnosis, treatment plan and insurance coverage available so that a discharge plan could be formulated. (*Id*.; A. Johnson Dep., 13:6-23). Plaintiff was also supposed to be prepared to answer questions about whether the patients are following his/her treatment plan, whether any changes to the treatment plan are recommended by any of the medical care providers, what type of discharge plan is appropriate based upon all of the information and insurance coverage available for either continued inpatient treatment or any treatment needed upon discharge. (Pl. Dep., 181:-183:1-15; A. Johnson Dep. 13:4-25). Typically, the list of patients up for discussion in FLASH meetings includes only 4-5 individuals that were expected to discharge. (A. Johnson Dep., 31:1-25;32:1-19).[8]

 Plaintiff was also responsible for completing Family Medical Leave Act ("FMLA") paperwork to ensure that a patient's time away from work is protected leave so the employee will not be subject to disciplinary action for missing work. (Pl. Dep., 297:1-25;298:1-2; Sowell Dep., 24:15-20). Finally, Plaintiff was responsible for gathering information needed to

---

[8] Since the patients at Parkwood are receiving inpatient treatment for serious mental health issues and/or addictive disorders, the patients are in crisis upon arrival at Parkwood. (Pl. Dep., 169-172; A. Johnson Dep., 42:6-25;43:1-10). As mentioned above, many times the patients are a suicide risk or at risk for harming someone else. (*Id*.). Therefore, it is crucial that upon discharge there is a discharge plan in place for the patient so that the risk of harm to the patient or someone else and the risk of relapse are minimal. (*Id*.).

complete the paperwork for patients being court committed for inpatient treatment. (Tyler Decl., ¶5). The attorney handling the commitment hearing needed proper documentation in support of the request for commitment. (*Id.*). Plaintiff's job was to complete the paperwork and get it to the attorney before the hearing, so that the commitment order could be issued. (*Id.*). Once the commitment order issued, it was Plaintiff's responsibility to advise the various caregivers at Parkwood of the commitment, so the patient could be treated consistent with the terms of the order. (*Id.*). There is no doubt that Plaintiff's job at Parkwood was important for effective patient care. (Pl. Dep., 169:4-13).

### E.    Plaintiff's 90-Day Evaluation

On February 5, 2009, Plaintiff had a 90-day Evaluation. (A. Johnson Dep., 21; 23:6-7;22:20-25; Ex. 1). The evaluation revealed that Plaintiff was having difficulties performing her job. Specifically, the evaluation revealed issues Plaintiff had preparing spreadsheets containing patient data and difficulty using the MIDAS system, which provides information about the patients in Parkwood's care. (A. Johnson Dep., 22:2-17; Ex. 1). Because the Director of UR is responsible for gathering and sharing information about patient care, an inability to use the very system that provides such information would be crippling to anyone holding that position.

Ms. Wallace was Plaintiff's supervisor at this point and was working with Plaintiff to try to help her develop the skills needed to successfully manage the UR Department. (Wallace Decl., ¶6; A. Johnson Dep., 24:14-25;25:1-18). However, even after being given time to learn the job and was provided significant support from Ms. Wallace, it was clear that Plaintiff was not getting the job done.

For example, many times when asked to provide information about the patients up for discussion in the FLASH meetings, Plaintiff could not provide meaningful information.

(Wallace Decl., ¶6). Frequently, when asked about a particular patient that Plaintiff should have been prepared to discuss, she would respond with "I don't know" or provide inaccurate information. (*Id*.). (A. Johnson Dep., 30:18-25;32:1-19;34:1-35:19;43:11-44:1; Pl. Dep., 188:21-25;189:1-12).

### F.     Parkwood Streamlines Job Titles

In January 2010, Parkwood changed the titles for second-level managers. (A. Johnson Dep., 51:16-25;52:1-14). Prior to the change, Parkwood's first-level and second-level managers were both titled "Director" of whatever department the employee managed. This made the chain of command confusing because a first-level manager that is responsible for supervising a second-level manager had the same job title of "Director." (A. Johnson Dep., 51:16-25;52:1-14). To eliminate the confusion, Parkwood determined that the title of "Director" would be assigned to all first-level management employees and the title of "Manager" would be assigned to all second-level management employees. (*Id*.).[9] The title change resulted in Plaintiff's title being changed from "Director of UR" to "Manager of UR." (A. Johnson Dep., 64:1-10; Pl. Dep., 126:1-12). The change was in title only and affected all managers at the same level. (A. Johnson Dep., 64:1-10). The change did not result in a change in Plaintiff's duties, rate of pay or anything other than the title itself. (Pl. Dep., 126:1-13;132:7-17; A. Johnson Dep., 64:1-10).

### G.     Plaintiff Calls the Global Compliance Hotline

Almost immediately after her title change, on March 2, 2010, Plaintiff made a call to Parkwood's Global Compliance Hotline and grumbled about her employment. (Pl. Dep., 125-133; Ex. 14). First, Plaintiff was upset that her job title was changed from "Director of UR" to

---

[9] Plaintiff was a second-level manager. (*Id*.).

"Manager of UR." (Pl. Dep., 126:1-12).[10]  Second, Plaintiff complained about being asked not to wear a white lab coat at work.[11]  (Pl. Dep., 126:13-16).  Third, Plaintiff complained about her salary.[12]

**H.    Parkwood Hires a New CEO & Plaintiff Gets a New Supervisor**

In 2010, Ken House took over as CEO at Parkwood.  (Pl. Dep., 190-191:1-8).  Upon his arrival, he changed many things, including the realignment of reporting levels within Parkwood.  (Pl. Dep., 191:4-8).  One such realignment occurred in June 2010 when Plaintiff was moved from being supervised by Ms. Wallace to being supervised by Ms. Tyler (Director of Quality & Risk Management).  The change was made because Ms. Wallace did not have time to properly manage Plaintiff and the decision was made to put Plaintiff under a more experienced manager, Ms. Tyler.  (A. Johnson Dep., 26:6-25;27:1-9).

**I.    Plaintiff's Performance Issues Continue**

Following the realignment, Plaintiff's performance issues continued.

**1.    Johnson's Corrective Action Report – August 4, 2010**

Ms. Tyler tried to be supportive and provide Plaintiff with additional guidance on a daily basis, however, she had to write-up Plaintiff for her continued poor performance.  (A. Johnson Dep., 27:9-25:28:1-9,65:14-25;66:1-8; Tyler Decl., ¶7; Pl. Dep., 216:9-25;218:1-20; Ex. 22).  The write up is detailed in a Corrective Action Form indicating Plaintiff exhibited an

---

[10] As mentioned above, Plaintiff's title change did not affect her pay, duties or anything other than the title itself. (Pl. Dep., 126:1-13;132:7-17; A. Johnson Dep., 64:1-10).

[11] When Plaintiff began her employment with Parkwood, she showed up in a white lab coat with "Dr. Laverne Johnson" stitched on the front.  (Pl. Dep., 130:11-19).  Of course, Parkwood is a hospital and there was concern that allowing an individual without a medical license to wear a medical lab coat might cause some of the patients to think that Plaintiff was a medical doctor.  (Pl. Dep., 127:17-25;128-131:4-24).  Plaintiff believed that her doctorate degree in theology from Jacksonville Theological Seminary school entitled her to wear a medical coat at the hospital.  (Id. & Ex. 1).

[12] Plaintiff believed that after her 90-day probationary period she should have received a raise.  (Pl. Dep., 126:17-23).  This is true even though Plaintiff's offer letter makes no mention of such a raise.  (Pl. Dep., Ex. 19).

"inattention to duties" and "unsatisfactory job performance." (Pl. Dep., Ex. 22). The Form

noted the following problems with Plaintiff's performance:

- Failure to provide doctors and other care providers information about medical coverage status which may result in unplanned discharges and days being left on the table.
- Poor communication with MDs resulted in unplanned discharges as well as not allowing for the patients to receive maximum care.
- During the week of July 26 the UR Department's failure to report a discharge to the NARC (admissions) department resulted in a lost admission.
- Comments made in morning FLASH meetings have continued to reveal lack of knowledge about the patients in our care.
- Received a grievance from a patient regarding Johnson's failure to complete Leave of Absence paperwork necessary for the patient to be away from work for treatment. The patient described Johnson as being "very blunt" and as having an "uncaring, unconcerned attitude."
- Johnson was making it a habit of taking 14 days to send out completed FMLA paperwork to the patient's employer, which was documented as an unacceptable practice.
- Audits on 7/21 reveal that Medicare certifications were not being placed in the required charts in a timely manner. A review on the morning Employee Corrective Action Report was completed (8/4/10) by Tyler revealed the same problem.
- Johnson was asked to provide an Action Plan to Tyler by 8/2, but apparently did not and gave Tyler excuses why it had not been done.

(Pl. Dep., Ex. 22).

In the Corrective Action Report, Ms. Tyler reminded Plaintiff of some of her job

duties, which were listed as: receiving authorizations, negotiating and advocating on behalf of

the patient and hospital for patient coverage from insurance companies, communicating

authorizations through reports and treatment team to physician and other staff, evaluating charts

at prescribed intervals, analyzing patient clinical information to determine length of stay,

assessing UR services and treating every patient as a guest by demonstrating professionalism and

meeting Parkwood's service excellence standards. (Pl. Dep., Ex. 22).

Plaintiff was told that if she did not improve her performance, she may be subject to corrective action, up to and including termination. (Pl. Dep., Ex. 22; Tyler Decl, ¶7). The form notes that Plaintiff's "actions seriously compromise the quality of patient care services." (Pl. Dep., Ex. 22). The plan for Plaintiff's improvement included a 30-day Action Plan, which incorporated Plaintiff's responsibilities. (Pl. Dep., Ex. 22). Plaintiff was to review the Action Plan weekly with Ms. Tyler. (Pl. Dep., Ex. 22). At the bottom of the form, Plaintiff wrote, "I will have my action plan re-visited by 8/5/10," and Plaintiff signed the Corrective Action Report. (*Id.*).

The "Corrective Action Plan Addendum" includes a list of actions Plaintiff agreed she would take "immediately" to improve the overall function of the UR Department. (*Id.*). The areas of improvement include unplanned discharges (i.e., patients being discharged without a discharge plan), days left on the table (i.e., patients being discharged despite having a treatment plan and insurance coverage which allowed for continued treatment), knowledge of patients, timely completing FMLA paperwork and issues related to the completion of the court commitment documents needed by the attorneys when securing a commitment order. (*Id.*).

## 2. Plaintiff Applies for Another Job, and Requests Accommodation Through an Attorney

Plaintiff wasn't happy about being disciplined. (Pl. Dep., 223:13-16). After being written up, rather than improving her performance, she decided to apply for another job. (Pl. Dep., 223:13-21). In fact, on August 5, 2010, the day after being written up, Plaintiff provided Ms. Tyler with notification that she had applied for a Program Director position at another facility. (Pl. Dep., 223:13-25;224:1-7).

Additionally, rather than improve her performance, Plaintiff decided, for the first time, to request an accommodation. (Pl. Dep., 224:8-23;235:1-12). Plaintiff did not at any time

prior to being reprimanded request any type of accommodation. (A. Johnson Dep., 37:8-11). It was only after she knew her job was in jeopardy that she decided to seek an accommodation. (*Id.*). Even so, and as described below, Parkwood provided every reasonable accommodation requested. (A. Johnson Dep., 37:20-24;38:1-3; Pl. Dep., 243:4-12;244:25;245-248:12).

On September 3, 2010, Plaintiff's then-attorney, Maureen Holland, sent a letter to Parkwood's counsel advising that she was retained by Plaintiff "in connection with her ongoing employment matters with Parkwood." (Pl. Dep., Ex. 24). The letter stated "I don't know if you are aware or not but Ms. Johnson suffers from a medical condition that impacts her work schedule at times." (*Id.*). The letter claimed that Plaintiff took time off and that the time off was related to her unidentified medical condition, and claimed she was penalized for taking the time off. (*Id.*) The letter concluded by asking for a reasonable accommodation for Plaintiff's medical condition and paperwork to complete for FMLA leave. (*Id.*).

On September 17, 2010, Plaintiff was given FMLA and ADA paperwork to complete so that she could request a medical leave and/or an accommodation. (Pl. Dep., 235-239:1-3). Additionally, A. Johnson provided Plaintiff with the necessary Certification of Health Care Provider for Employee's Serious Health Condition form for Plaintiff's physician to complete. (Pl. Dep., 239:5-14).

On October 4, 2010, Plaintiff provided a completed "Employee Request for Accommodation" form to Parkwood. (Pl. Dep., 236:20-25;243:1-12; Ex. 25). On the form, Plaintiff indicated that she has Bipolar Disorder, heart problems, arthritis, sleep apnea, diabetes and migraines. (*Id.*). When asked how the impairments affect her ability to perform her job, Plaintiff wrote that decreased or increased sleep, poor concentration, increased anxiety, mood swings and racing thoughts all affect her ability to work. (*Id.*). When asked what accommodation she is seeking, Plaintiff wrote that she needs Parkwood to re-evaluate her job

duties; adequately staff her department; that she needs to be able to take time off when flare-ups occur or when she needs to go to the doctor; and she needs a decrease of her work. (*Id.*). Plaintiff indicated on the form that the requested accommodations would help her "be more effective in completing" her job functions and would decrease her anxiety and stress. (*Id.*).

On October 1, 2010, Dr. Gunn-Hill completed the Certification of Health Care Provider form. (Pl. Dep., Exs. 26, 27). He indicated Plaintiff was able to perform the essential functions of her job, except when she has a flare-up of her episodic condition. (*Id.*). When asked whether Plaintiff's impairment limits one or more major life activities, Dr. Gunn-Hill checked "no." (*Id.*). According to Dr. Gunn-Hill the only accommodation needed by Plaintiff was coverage when "she has a flare-up or when she needs to take time off for doctors' appointments." (*Id.*).

**J.      Plaintiff is Provided With Every Accommodation Requested**

On October 5, 2010, Plaintiff gave A. Johnson at Parkwood a list of doctors' appointments that she needed to attend, all of which were accommodated by Parkwood. (Pl. Dep., 245:4-25;246-247;258:1-9; Ex. 28; A. Johnson Dep., 37:8-25;38:1-3). The only other accommodation identified as necessary by Dr. Gunn-Hill was time off for Plaintiff's "flare-ups." However, Plaintiff never requested time off for any "flare-ups."[13] (Pl. Dep., 247:10-25;248:1-12).

---

[13] The only other accommodation mentioned by Plaintiff was the request for Parkwood to re-evaluate her job duties, increase staffing in her department and decrease her work. (Pl. Dep., Ex. 25). Notably, Plaintiff's physician made clear in the Certification of Health Care Provider for Employee's Serious Health Condition that the only accommodations Plaintiff needed included time off when flare-ups occurred and time off to attend doctors' appointments. (Pl. Dep., Ex. 26). Of course, the ADA does not require Parkwood to provide the "best" accommodation or Plaintiff's preferred accommodation; it requires only that Parkwood provide an accommodation that "is sufficient to meet the job-related needs of the individuals being accommodated." *Picard v. St. Tammany Parish Hosp.*, 611 F.Supp.2d 608, 622 (E.D.La.2009), citing *E.E.O.C. v. Argo Distribution.* 555 F.3d 462, 471 (5th Cir.2009). Additionally, the ADA does not require the employer to provide a disabled employee with alternative employment when the employee is unable to meet the demands of her present position. (*Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995), create a position not then in existence (*Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719,

### K. Plaintiff's Final Written Warning – October 29, 2010

Despite Parkwood's willingness to accommodate Plaintiff, she continued to have performance issues. As a result, she was issued a "Final Written Warning" dated October 29, 2010. (Pl. Dep., 250-256:14; Ex. 29). Plaintiff was issued the warning, in part, because she failed to timely complete court commitment paperwork needed for the court commitment of a patient at Parkwood. (*Id.*;Tyler Decl., 8). The patient at issue was psychotic and needed close supervision and inpatient treatment. (A. Johnson Dep., 28:13-25;29:1-25;30:1-17). Because Plaintiff failed to complete the commitment paperwork and get it to the attorney handling the hearing, Ms. Tyler had to step in, get the paperwork ready and physically drive it to the attorney's office. (*Id.*). In short, Ms. Tyler was prevented from doing her job and forced to do Plaintiff's job. The final warning also addressed an event on August 10, 2010, when Plaintiff was supposed to provide to the leadership team an accurate list of patients scheduled for discharge during the morning FLASH meeting. (*Id.*). Plaintiff's list was inaccurate, again demonstrating Plaintiff's inability to collect and provide the information needed during FLASH meetings. (*Id.*).

The Final Written Warning advised Plaintiff that immediate improvement of her performance was required for continued employment and her failure to improve could result in her termination. (*Id.*). Although there was space provided for employee comments, Plaintiff did not deny that her performance was unsatisfactory, claim that any disability was preventing her from doing her job or write any comment at all. (*Id.*). Plaintiff did, however, sign the form. (*Id.*).

---

729 (6th Cir.2000), or hire a helper for the disabled employee (*Ricks v. Xerox Corp.*, 877 F.Supp. 1468 (D.Kan.1995).

2176555.1

14

### L.      Plaintiff Refuses to Change Her Ways, Even After a Final Warning

Unfortunately, Plaintiff's performance issues continued. She readily admits that she did not attempt to improve her performance because she believed she was doing a good job. (Pl. Dep., 256:6-24). Even so, rather than simply terminate Plaintiff, Parkwood looked for ways to assist her.

At the request of Mr. House, on March 4, 2011, Plaintiff, Ms. Tyler and Ms. Wallace submitted an "Action Plan to Reduce Premature Discharges (Increase L[ength] O[f] S[tay])." (Pl. Dep., 261-262:2-11;265:4-9; Ex. 31). Plaintiff also was asked to be prepared to talk during a quarterly meeting about Length of Stay statistics for the company, which would detail how long patients stayed at the hospital versus how long the insurance company pre-authorized for treatment. (Wallace Decl., ¶7). Ms. Wallace prepared a Length of Stay report for Plaintiff to use during the meeting and told Plaintiff to be prepared to discuss the data contained in the report. (*Id.*). Rather than familiarizing herself with the data contained in the report, at the meeting Plaintiff began making wild accusations about a "problem" the hospital was having with increased denials of coverage by the insurance companies. (*Id.*). The "facts" espoused by Plaintiff were not accurate and not reflected in the data provided by Ms. Wallace. (*Id.*). When asked about her accusations, Plaintiff said that the denials were occurring because "all departments" were failing to provide Plaintiff with the information she needed to seek approval from the insurance companies. (*Id.*). Once again, Plaintiff refused to take responsibility for her own failures, and instead pointed the finger at "all departments" at Parkwood. Ms. Wallace was forced to tell Mr. House that the data prepared for the meeting did not substantiate Plaintiff's allegations. (*Id.*).

### M.    Johnson's Termination – April 1, 2011

Despite Parkwood's ongoing efforts to counsel and coach Plaintiff, she did not appear to comprehend the significance of her role or take ownership of her failures. She continued performing her duties inadequately and rather than focus on correcting her deficiencies, she made excuses. As a result, Plaintiff was terminated on April 1, 2011. (Pl. Dep., 123:4-16;267:7-25;68:1-24). Plaintiff's supervisor, Ms. Tyler and Mr. House made the decision to terminate Plaintiff. (A. Johnson, Dep., 41:9-15; Tyler Decl., ¶9). Some of the ongoing issues that played into Plaintiff's termination were: (1) Plaintiff's failure to exhibit knowledge of planned care for patients being discharged from inpatient services; and (2) Plaintiff's failure to provide accurate patient care data to support information in her monthly reports, which "seriously compromised the quality of patient care services." (Pl. Dep., Ex. 33). The bottom line is that Plaintiff continued exhibiting the same poor performance that she was counseled on from the very beginning. Notably, Plaintiff signed her Termination Form without refuting any of statements made therein. Likewise, Plaintiff did not at any time during her termination meeting claim that she was subjected to discrimination and/or retaliation. (Tyler Decl., ¶9).

### N.    Plaintiff's Poor Performance Continued to Surface After She Left

Even after Plaintiff was terminated and no longer working at Parkwood, issues continued to surface. Parkwood received complaints from patients who said their FMLA paperwork was not completed and returned and the patient was subject to possible termination as a result. (Sowell Dep., 23:8-25;24:1-20; Tyler Decl., ¶10). Overdue and uncompleted FMLA paperwork was located in Plaintiff's office. (*Id.*). Some of the FMLA paperwork was never located at all. (*Id.*). There also were unopened letters found in Plaintiff's old office. (*Id.*). The letters, some of which were a month old, advised of denials of insurance coverage and the process for appealing that decision. (*Id.*). Finally, Parkwood conducted regularly scheduled

Medicare audits of eleven (11) charts and found that compliance was 45% lower than the required goal, which could result in unpaid days for services provided. (Tyler Decl., ¶11). Plaintiff's failures were below the expectations of Parkwood and were of such severity that if Parkwood had known about any one of the performance issues, Plaintiff would have been terminated for that reason alone. (*Id.*).

### O. Plaintiff Admits Ms. Tyler and/or Mr. House Knew Nothing About Plaintiff's Alleged Disability or Compliance Call

Plaintiff admits that she has no evidence to suggest that Ms. Tyler or Mr. House, the individuals involved in the decision to terminate her, knew anything about her alleged disability. (Pl. Dep., 274:6-14). Likewise, Plaintiff admits that she has no evidence that Ms. Tyler knew anything about the call to the Global Compliance Hotline that Plaintiff made in March 2010 and Mr. House was not the CEO of Parkwood until months after Plaintiff made the complaint. (Pl. Dep., 190:3-18;221:22-25).

## III. LEGAL ANALYSIS

Now despite Plaintiff's clear inability to perform her duties according to Parkwood's legitimate standards, she claims she was terminated due to her disability as well as out of retaliation. Additionally, Plaintiff claims that Parkwood failed to provide her with a reasonable accommodation, even though the facts demonstrate otherwise.

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedures states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine disputes as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(a); see also *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir.2010). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely

demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Brown v. Prentiss Regional Hosp.*, WL 610520, *3 (S.D.Miss.,2013), citing *Cuadra v. Houston Indep., Sch. Dist.*, 626 F.3d 808, 812 (5th Cir.2010). The nonmovant "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* "An issue is material if its resolution could affect the outcome of the action." *Id.*, citing *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.*, citing *Cuadra,* 626 F.3d at 812.

Because there is an absence of evidentiary support for Plaintiff's claims, Parkwood is entitled to judgment as a matter of law.

### B. Parkwood is Not Owned by Universal Health Services Foundation, a/k/a Universal Health Services, Inc.

As an initial note, Plaintiff has identified improper entities in her Complaint. Plaintiff claims in her lawsuit that Parkwood is owned by Universal Health Services Foundation, a/k/a Universal Health Services, Inc. However, that is not the case. (Tyler Decl., ¶13). Parkwood is not owned by Universal Health Services Foundation, and Universal Health Services Foundation is not also known as Universal Health Services, Inc. (*Id.*). Plaintiff was never employed by Universal Health Services Foundation or Universal Health Services, Inc. Thus, she cannot maintain a claim against either entity. Furthermore, only Parkwood was listed in Plaintiff's Charge and case law makes clear that only entities included in a Charge filed with the EEOC are proper defendants to the subsequent lawsuit relating to the same Charge. See *Woods v. City of Galveston*, 5 F.Supp.2d 494, 501 (S.D.Tex.1998) (dismissing claims against defendant because plaintiff's EEOC Charge of discrimination failed to mention defendant, thus plaintiff only received administrative review of allegations against an entity separate from defendant being dismissed).

### C. Any Claims Outside the Scope of Plaintiff's Charge of Discrimination Must Be Dismissed.

Plaintiff raises a plethora of allegations/potential claims in her Complaint and deposition which are barred because they are outside the scope of her Charge of Discrimination filed with the EEOC. Those claims should be dismissed, as a matter of law.

Plaintiff's Charge includes specific allegations relative to disability discrimination and retaliation in response to a complaint made by her in August or September 2010.[14] (Docket Entry No. 1, Ex. A). Plaintiff indicated that the alleged discrimination took place on April 1, 2011, and included the following specific allegations:

> I was denied a reasonable accommodation for my disability and discharged on April 1, 2011, in retaliation for making a complaint in or about August or September 2010. I began my employment with the above company in November 2008.
>
> I was told by Joyce Tyler, Risk Manager and Audrey Johnson, Human Resources Director the reason that I was being discharged was for not performing at an acceptable level. I received new job standards and wasn't given enough time to adjust: since my employment I have received good performance evaluations.
>
> I believe that I have been discriminated against because of my disability in violations of the American with Disabilities Act, Amendment Act (ADAAA). I believe that I have been discrimination against in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.* Rather than limiting her lawsuit to the scope of her Complaint, Plaintiff includes the following allegations that are outside the scope of her Charge:

1. Retaliation Related to a March 2010 Compliance Call;[15]

2. Allegations of Improperly/Fraudulently/Illegally Falsifying Reports/Records;[16]

---

[14] On her EEOC Charge, Plaintiff checked the boxes for "disability" and "retaliation." (Docket Entry No. 1, Ex. A).

[15] See Docket Entry No. 1, ¶9 & Ex. A; Pl. Dep., 120:8-25;121:4-18;122:1-9; 125:20-25;129:1-25:130-133.

3.       Allegations of Racial Discrimination;[17]

4.       Allegations of Religious Discrimination;[18] and

5.       Allegations of Age Discrimination[19].

Because all of the allegations are outside the scope of Plaintiff's Charge, they should be dismissed as a matter of law.

Plaintiffs filing suit under Title VII must follow certain administrative requirements. Specifically, Plaintiff must file "a charge with the EEOC, as a precondition to filing suit in district court." *McDonald v. S. Diversified Indus., Inc.*, WL 22244321, at*3 (N.D.Miss. Aug. 5, 2003), citing *Taylor v. Books A Million*, 296 F.3d 376, 379 (5th Cir.20020). "The scope of a Title VII complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. The scope of the inquiry is not, however, limited to the exact charge brought to the EEOC." *Dugas v. St. Charles Community Health Center, Inc.*, WL 6934694, at*7 (E.D.La.,2011); *McDonald v. S. Diversified Indus., Inc.*, WL 22244321, at*3 (N.D.Miss. Aug. 5, 2003) and *Thomas v. Tex. Dep't of Crim. Justice*, 200 F.3d 289, 295 (5th Cir.,2000); *Young v. City of Houston*, 906 F.2d, 177, 179 (5th Cir.1990); *Fellow v. Universal Restaurants, Inc.*, 701 F.2d 447, 451 (5th Cir.1983). [I]f the claim is not raised in the EEOC charge and is not 'reasonably related,' it is precluded from the Court's consideration." *Waldermar v. American Cancer Society*, 971 F.Supp. 547, 533 (N.D.Ga.1996).[20]

---

[16] See Docket Entry No. 1, ¶14; Pl. Dep., 202:8-203:14.

[17] See Docket Entry No. 1, ¶15; Pl. Dep. 193:5-194:1;195-198.

[18] See Pl. Dep., 120:22-121:3;124:7-25;217:3-14

[19] See Docket Entry No.1, ¶6

[20] "The underlying reason for this is that 'Congress wanted the EEOC to have an opportunity to investigate and attempt conciliation of all claims before litigation was brought." *Butler v. Matsushita Comm. Indus. Corp. of U.S.*, 203 F.R.D. 575, 580 (N.D.Ga.,2001), citing *Clark v. City of Macon, Georgia*, 860 F.Supp. 1545, 1551 (M.D.Ga.1994).

2176555.1

Claims about retaliation occurring as a result of a March 2010 Global Compliance call, falsifying records, race discrimination, religious discrimination or even claims under the ADEA were not included in the Charge and are not reasonably related to claims alleged in the Charge. Thus, they should be dismissed. See *Ghahramani v. BASF Corp.*, 755 F.Supp. 708 (M.D.La.,1991) (dismissing claims of age and race discrimination because they were outside the scope of the EEOC Charge); *Buffington v. General Time Corp.*, 677 F.Supp. 1186, 1192 (M.D.Ga.1988) (finding that plaintiff's charge of unlawful transfer was not reasonably related to allegation in complaint of age discrimination and failure to promote); *Clements v. H. Goodman & Sons*, 25 Fair Empl.Prac.Cas. (BNA) 511, 512-13 (N.D.Ga.1981 (finding that plaintiff's charge alleging unlawful discharge not reasonably related to later raised claims of failure to promote and failure to transfer); *EEOC v. Agro Distrib.*, LLC, 555 F.3d 462, 469 (5th Cir.2009) (EEOC's conciliation requirements is precondition to suit). That leaves Plaintiff's claim that she was denied a reasonable accommodation for her disability and discharged in retaliation for making an internal complaint in August/September 2010.[21]

---

[21] To the extent Plaintiff's EEOC charge could be read as including a claim that she was terminated because of her disability, Plaintiff may be precluded from asserting alternative motives for her termination. Case law suggests the ADA prohibits employers from taking adverse employment action against employees *solely because of* his/her disability. *Rizzo v. Children's World Learning Centers, Inc.*, 173 F.3d 254, 269 (5th Cir. 1999) ("The ADA, however, prohibits an employer from taking an adverse employment action against an employee based solely on the basis of the employee's disability."). Of course, Plaintiff is alleging her termination was "purely retaliatory" for engaging in protected activities. (Complaint, ¶14). Plaintiff cannot have it both ways. She cannot simultaneously pursue claims under the ADA and Title VII related to the same adverse employment action, as a finding of retaliation under Title VII forecloses the possibility of a finding of discrimination under the ADA. Accordingly, the Court should require Plaintiff to choose between her claims. *See Culver v. Birmingham Bd. of Educ., et al.*, 646 F. Supp. 2d 1270, 1271-72 (N.D. Ala. 2009) (the court required plaintiff to choose between his ADA and Title VII claims).

### D. Plaintiff's Disability Discrimination & Retaliation Claims Fails

Plaintiff alleges that she was discriminated against based upon her disability and that she was retaliated against in violation of Title VII.[22]  To establish a *prima facie* claim of disability discrimination, Plaintiff must show she: (1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action; and (4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *See, e.g., Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).  With regard to her claims of retaliation, Plaintiff must show that (1) she participated in a protected activity; (2) she suffered an adverse employment action by Parkwood; and (3) a causal connection between the protected activity and the adverse action.  *Stewart v. Mississippi Transp. Com'n*, 586 F.2d 321, 331 (5th Cir. 2009).

If Plaintiff is able to establish a *prima facie* case with respect to either claim, "an inference of discrimination [or retaliation] is raised, and the burden shifts to [Parkwood] to offer a legitimate, non-discriminatory[/non-retaliatory] reason for the adverse employment action.  *Lee v. Kan City S. Fy.*, 574 F.3d 253, 359 (5th Cir. 2009).  Once Parkwood puts forth its legitimate, non-discriminatory/non-retaliatory reason for the adverse employment action, Plaintiff must show that the reason is merely a pretext for discrimination.  (*Id.*).  That means, in order to prevail, she must then prove by a preponderance of the evidence that the reasons offered by Parkwood were false and the real reason was her disability and/or retaliation.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993).  In other words, Plaintiff must show that Parkwood's explanation regarding its actions is unworthy of credence.

---

[22] Johnson's Complaint does not necessarily identify a claim of race discrimination, but to the extent she attempts to argue race-based discrimination, those claims are barred as they were not raised in her EEOC Charge.  Any such claim likewise would fail because Plaintiff was terminated for a reason which she cannot prove is pretext.

Plaintiff is not able to present evidence sufficient to establish a *prima facie* case of disability discrimination or retaliation under Title VII and summary judgment is appropriate.

### 1.  Protected Class Element

For purposes of summary judgment only, Parkwood admits that Plaintiff may be able to establish the first element of her *prima facie* case of disability discrimination in light of all of the physical/mental impairments from which she allegedly suffers.  However, with respect to her Title VII retaliation claim, Plaintiff is not able to establish she engaged in "protected activity" under the law.

In her EEOC Charge, Plaintiff refers to an internal complaint she made in "August or September 2010."  (Docket Entry No. 1, Ex. A).  However, she never made any complaint at that time.  In her Complaint, Plaintiff refers to her call in March 2010 to the Global Compliance line when she complained about her title change, not getting a raise after her 90-day probationary period and not being allowed to wear a white lab coat and have folks call her "Dr. Laverne Johnson."  Notably, during the call Plaintiff made no mention of *any* protected category under Title VII and therefore did not engage in protected activity.[23]

To sustain a retaliation claim under Title VII, Plaintiff must prove she engaged in protected activity through either: (1) the "participation clause" which applies when an employee "has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under Title VII;" or (2) the "opposition clause" which applies when an

---

[23] Of course, allegations in the Complaint regarding the March 2010 Compliance Call are outside the scope of the EEOC Charge and should be dismissed.  However, even if the Court considers Plaintiff's March 2010 Compliance Call as within the scope of her Charge, the complaint did not amount to protected activity and Plaintiff's retaliation claims still fails. See *Ghahramani v. BASF Corp.*, 755 F.Supp. 708 (M.D.La.,1991) (dismissing claims of age and race discrimination because they were outside the scope of the EEOC Charge); *Buffington v. General Time Corp.*, 677 F.Supp. 1186, 1192 (M.D.Ga.1988) (finding that plaintiff's charge of unlawful transfer was not reasonably related to allegation in complaint of age discrimination and failure to promote); *Clements v. H. Goodman & Sons*, 25 Fair Empl.Prac.Cas. (BNA) 511, 512-13 (N.D.Ga.1981 (finding that plaintiff's charge alleging unlawful discharge not reasonably related to later raised claims of failure to promote and failure to transfer).

employee "has opposed a violation of Title VII." *Williams v. Recovery School District*, 859 F.Supp.2d 824, 830 (5th Cir.2012); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir. 1989). The distinction between the type of activities protected by the clause is significant because the courts "have generally granted less protection for opposition than for participation in enforcement proceedings." *Id*. The participation clause extends to persons who have "participated in any manner" in formal proceedings. *Id.* Such is not the case here.

Rather, Plaintiff alleges activity under the "opposition clause," which does not protect all opposition activity. See *Smith v. Texas Dep't of Water Resources*, 818 F.2d 363, 365-66 (5th Cir.1987); *Jones v. Flagship Int'l*, 793 F.2d 714, 727 (5th Cir.1986). To qualify as protected activity under the opposition clause, Plaintiff must prove "she had at least a 'reasonable belief that the practices she opposed were unlawful.'" *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir.1996). "Complaints to employers that do not complain of conduct protected by Title VII do not constitute protected activities under the statute." *Cavazos v. Springer*, WL 2967066, *7 (S.D.Tex.,2008); see also *Watts v. Kroger*, Co., 170 F.3d 505, 507 (5th Cir.1999) (employee that complained about treatment at work, but who did not report or allege any connection to an unlawful employment action did not amount to protected activity); *Baker v. Union Pac. R.R. Co*., 145 F.Supp.2d 837,844 (S.D.Tex.2001) ("To qualify as protected activity, the complaints must relate clearly to discrimination covered by Title VII."). "The employee's opposition to an illegal employment practice must raise the issue of discrimination and identify the allegedly discriminatory practice; complaints about unfair treatment in general or expressions of dissatisfaction … that do not specifically complain of discrimination are not protected activity." *Seldon v. National Railroad Passenger Corp*., 452 F.Supp.2d 604 (E.D. Pa. 2006).

Plaintiff's "complaints" do not rise to this level and do not qualify as protected activity. See *Jones v. CVS Pharmacy, Inc.*, WL 1904842, *4 (N.D.Tex.,2009) (generally complaining about work conditions and treatment by coworkers without allegation or reference to any unlawful employment practice does not amount to protected activity under Title VII); *Nigro v. St. Tammany Parish Hospital*, 377 F.Supp.2d 595 (E.D.La.,2005) (nurse who complained about being generally offended by supervisor's comments, but who did not make assertions of harassment or discrimination within the scope of Title VII did not engage in protected activity); *Watkins v. Tex. Dep't of Criminal Justice*, WL 686571, at *3 (5th Cir. Mar.12, 2008) (stating that plaintiff's belief that he was treated unfairly because of critical comments he made to the media concerning prison under-funding and staff shortages are not protected activity under Title VII, and therefore cannot serve as grounds for Title VII retaliation action.).[24]

Plaintiff's Complaints about her title change, not getting a raise and not being allowed to wear a lab coat, do not amount to protected activity because she did not allege any unlawful employment practice within the scope of Title VII.  Accordingly, Plaintiff cannot establish the first element necessary for a *prima facie* case of retaliation and her claim should be dismissed.

### 2.      Plaintiff Cannot Establish the Requisite Causal Connection

Likewise, Plaintiff is unable to establish the necessary connection between her termination and her disability or internal complaints.  To determine whether the necessary causal

---

[24] *See also*, *Mann v. First Union National Bank*, 2006 WL 1676397 (4th Cir. June 13, 2006) (employee's memoranda to supervisor concerning the employer's failure to consult her prior to hiring a female applicant, excluding her from a sales meeting, and a co-worker's reference to her as a "nosey busy body" did not involve unlawful employment actions prohibited by Title VII, and thus employees sending such memoranda did not engage in protected activity as required for employee's retaliatory termination claim); *Warmack v. Delta Airlines, Inc.*, 1994 WL 702630, **3 (6th Cir. Dec. 15, 1994) (employee's telephone call to member of management to question supervisor's disciplinary decision did not constitute protected activity under Title VII's opposition clause); *Longshore-Pizer v. Connecticut*, 451 F.Supp.2d 401 (D. Conn. 2006) (the plaintiff's complaints about her training and performance evaluations were not protected activities under Title VII).

link exists, three factors are considered: 1) the employee's past disciplinary record; 2) whether the employer followed its typical policy and procedures in terminating the employee; and 3) temporal proximity between the employee's conduct and the termination. *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir.1994).

Again, Plaintiff must prove that her disability was the *sole* reason for her termination in the event she asserts she was terminated because of her disability. *Amato v. St. Luke's Episcopal Hosp.*, 987 F.Supp. 523, 530 (S.D.Tex.,1997), citing *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir.1996). This is a difficult standard and in light of her repeated and ongoing performance deficiencies, Plaintiff cannot establish the *sole* cause element of her disability claim.

As for her Title VII retaliation claim, Plaintiff cannot establish the necessary proof. Specifically, she cannot establish the relevant decision makers, Ms. Tyler and Mr. House, had any knowledge of her Global Compliance call. Without evidence of such knowledge, Plaintiff cannot establish the necessary causal connection. *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) (the decision maker's knowledge of the protected activity is an essential element of the *prima facie* case of unlawful retaliation).[25]

Further, with regard to temporal proximity, Plaintiff's termination did not occur until April 1, 2011, more than seven (7) months after the alleged "complaint made in or about August or September 2010" as set forth in her Charge, more than seven (7) months after her lawyer sent a letter seeking an accommodation and more than a year after Plaintiff's call to the March 2010 Global Compliance hotline that she mentions in her Complaint. "In this Circuit,

---

[25] *See also, Johnson v. U.S. Dept. Health*, 30 F.3d 45 (6th Cir. 1994) (affirming summary judgment where the plaintiffs failed to establish the relevant decision maker knew of their protected activity); *Anderson v. Kelly*, 1993 WL 524235 (6th Cir. Dec. 15, 1993) (the plaintiff could not succeed on the merits of her retaliation claim where the individual she alleged retaliated against her was unaware of her previous protected activity).

similar lapses of time, by themselves, have been insufficient to show a causal link." *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed.Appx. 437, 443 (5th Cir.2007), citing *Bell v. Bank of America*, 171 Fed.Appl 442, 444 (5th Cir.2006) (seven-month lapse insufficient to demonstrate a causal link); *Myers v. Crestone Intern., LLC*, 121 Fed.Appx. 25, 28 (5th Cir.2005) (three-month lapse insufficient to create causal link); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir.2002) (five-month lapse did not create a causal link).

Moreover, Plaintiff admits that she has no evidence to suggest that either individual involved in the decision to terminate her (Ms. Tyler and Mr. House) knew anything about any alleged disability or the call to the Global Compliance Hotline. (Pl. Dep., 190:3-18;274:6-14;221:22-25).

### 3. Plaintiff Cannot Establish that She was Replaced by a Non-Disabled Person or that Non-Disabled Individuals Were Treated More Favorably

In addition, Plaintiff cannot satisfy the fourth element of a *prima facie* case of discrimination by showing that she was replaced by a non-disabled person, that she was treated less favorably than a non-disabled person or through some other means. See *Amato v. St. Luke's Episcopal Hosp.*, 987 F.Supp. 523, 533 (S.D.Tex.,1997). Although "evidence necessary to support an inference of discrimination will vary from case to case," Plaintiff has presented no evidence to support such an inference. *Id.*, citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d, 989, 994 (5th Cir.1996). Because Plaintiff cannot prove evidence with respect to the fourth element, she likewise fails to establish a *prima facie* case of disability discrimination.

### 4. Plaintiff Cannot Overcome Parkwood's Legitimate Non-Discriminatory/Non-Retaliatory Reason for Her Termination

Moreover, Parkwood has a legitimate, non-discriminatory/non-retaliatory reason for Plaintiff's discharge: Plaintiff's poor performance that was documented before any disability

was known to anyone at Parkwood.  Thus, even if Plaintiff was able to establish a *prima facie* case of disability discrimination and/or retaliation, her claims still fail.  See *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996) (because an essential element of most jobs is an ability to appear for work and to complete assigned tasks within a reasonable period of time, reason for termination was legitimate, non-discriminatory reason); *Chaney v. New Orleans Public Facility Management, Inc.*, 179 F.3d 164, 167-68 (5th Cir.1999) (failure of a subordinate to follow the direct order of a supervisor is a legitimate nondiscriminatory reason for discharging employee).

In attempting to establish pretext, Plaintiff cannot solely rely on her subjective belief that discrimination/retaliation occurred.  See *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 336 (5th Cir.1997); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996); *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir.1995).  "Similarly, the evidence of pretext must be more substantial than pure speculation."[26]  *Amato v. St. Luke's Episcopal Hosp.*, 987 F.Supp. 523, 533 (S.D.Tex.,1997), citing *Nichols*, 81 F.3d at 42.  Plaintiff must present actual evidence establishing Parkwood's articulated reason: (1) had no basis in fact; (2) did not actually motivate its actions; or (3) was insufficient to motivate its actions.  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083-1084 (6th Cir. 1994).

Plaintiff cannot show that Parkwood's proffered reason is a pretext for discrimination and/or retaliation.  Beyond speculation and conjecture, she has no evidence that Parkwood's nondiscriminatory/nonretaliatory reason is untrue or that the real reason for her

---

[26] "Moreover, the employment discrimination[/retaliation] laws are 'not intended to be a vehicle for judicial second guessing of business decisions, nor . . . to transform the courts into personnel managers.'"  *Id.*, citing *EEOC Louisiana Office of Community Servs.*, 47 F.3d 1438, 1448 (5th Cir.1995).  "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions . . .'"  *Id.*, citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991).

termination is disability discrimination or retaliation. See *Amato v. St. Lukes Episcopal Hosp.*, 987 F.Supp.523, 534 (S.D.Tex.,1997). The fact is, Plaintiff was coached repeatedly with respect to her poor performance and Plaintiff admitted that despite being provided with a final written warning and told that immediate improvement may result in her termination, she refused to change her ways. (Pl. Dep., 256:6-24).

Plaintiff can present no evidence establishing Parkwood's reason for her termination was pretexual. Thus, her claims fail and should be dismissed.

### E.    Plaintiff's Reasonable Accommodation Claim Fails

Plaintiff also claims that Parkwood failed to accommodate her disability. However, Plaintiff is unable to establish a *prima facie* case of failure to accommodate. To successfully assert a claim under the ADA's accommodation provision, Plaintiff must show: (1) she is disabled within the meaning of the Act; (2) she is a "qualified individual with a disability," meaning she is capable of performing all essential functions of her position with or without accommodation; (3) her employer was aware of her disability; (4) an accommodation was needed, i.e., a causal relationship existed between the disability and the request for accommodation; and (5) the employer denied her reasonable accommodation. *Davis v. City of Grapevine*, 188 S.W.3d 478 (Tex.App.-Fort Worth,2006); *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir.2009); see also *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir.2004).

"When the employee seeks a reasonable accommodation, she must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation." *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719, 728 (6th Cir.2000). Under the ADA, "to determine the appropriate reasonable accommodation for a given employee, it may be necessary for the employer to initiate an informal, interactive process with the employee." *Kleiber v. Honda of Am. Mfg.*, Inc., 485

29

F.3d 862, 871 (6th Cir.2007); *Picard v. St. Tammany Parish Hosp.*, 611 F.Supp.2d 608, 620 (E.D.La.,2009). That interactive process may include the employer requiring "that the individuals with a disability provide documentation of the need for accommodation." *Picard v. St. Tammany Parish Hosp.*, 611 F.Supp.2d 608, 623 (E.D.La.,2009), citing *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 n. 9 (5th Cir.1996) (quoting EEOC Interpretive Guidance).

In the present matter, Plaintiff's attorney sent a letter to Parkwood on September 3, 2010, advising Parkwood, for the first time, that Plaintiff claimed to have a disability and needed an accommodation. (Pl. Dep., 224:8-23;235:1-12). Immediately thereafter, Plaintiff was provided with ADA and FMLA documentation so that she could request any necessary accommodation and/or medical leave. (Pl. Dep., 235-239:1-3). After completing the FMLA and ADA paperwork and after Parkwood sought additional information from Plaintiff's doctor, it became clear that the only accommodation Plaintiff needed was time off work to attend medical appointments and "coverage" during flare-ups. (Pl. Dep., 236:20-25;243:1-12 & Exs. 25, 26 & 27). Plaintiff readily admits that she was provided time off to attend all doctor's appointments requested and that she did not seek any accommodation for any subsequent "flare-ups." (Pl. Dep., 245:4-25;246-248:12 & Ex. 28; A. Johnson Dep., 37-38:3). Parkwood provided each and every reasonable accommodation requested by Plaintiff, thereby destroying Plaintiff's hopes of establishing a *prima facie* case of failure to accommodate under the ADA.[27] Plaintiff's failure to accommodate claim should be dismissed.

---

[27] The only other accommodation mentioned by Plaintiff was the request for Parkwood to re-evaluate her job duties, increase staffing in her department and decrease her work. (Pl. Dep., Ex. 25). However, "the ADA does not require Parkwood to provide the 'best' accommodation or Plaintiff's preferred accommodation; it requires only that Parkwood provide an accommodation that "is sufficient to meet the job-related needs of the individuals being accommodated." *Picard v. St. Tammany Parish Hosp.*, 611 F.Supp.2d 608, 622 (E.D.La.2009), citing *E.E.O.C. v. Argo Distribution* , 555 F.3d 462, 471 (5th Cir.2009). Additionally, the ADA does not require the employer to

2176555.1

30

## IV.    CONCLUSION

For the reasons stated here, Plaintiff is unable to establish either a *prima facie* case of disability discrimination and/or retaliation and Parkwood is entitled to judgment as a matter of law.

Date: March 5, 2013                                      Respectfully submitted,


*s/ Marcia Dawn McShane*

Mary Dohner Smith, TN BPR #21451
Marcia Dawn McShane, TN BPR # 20878
Attorneys for Defendant

**CONSTANGY, BROOKS & SMITH, LLP**
401 Commerce Street, Suite 700
Nashville, TN 37219
(615) 320-520
(615) 321-5891 (facsimile)


*s/ Joseph Michael Koury*

*w/ permission by Marcia Dawn McShane*
Joseph Michael Koury, MS BPR # 9737
Attorney for Defendant

**ALLEN, SUMMERS, SIMPSON, LILLIE & GRESHAM**
80 Monroe Ave. , Ste. 650
Memphis, TN 38103

---

provide a disabled employee with alternative employment when the employee is unable to meet the demands of her present position (*Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995), create a position not then in existence (*Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 729 (6th Cir.2000), or hire a helper for the disabled employee (*Ricks v. Xerox Corp.*, 877 F.Supp. 1468 (D.Kan.1995). Furthermore, Plaintiff's physician made clear in the Certification of Health Care Provider for Employee's Serious Health Condition that the only accommodations Plaintiff needed included time off when flare-ups occurred and time off to attend doctors' appointments. (Pl. Dep., Ex. 26).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed electronically via the Court's electronic filing system in which a copy will be provided to the following counsel of record: Mr. Keith M. Alexander, Esq., Lipscomb Pitts Building, Suite 818, Box 23, 2670 Union Avenue Extended, Memphis, TN 38112 and Dana J. Swan, PO Box 428, Clarksdale, MS 38614, on this 5th day of March, 2013.

s/ __*Marcia Dawn McShane*__